WILLIAM J. BAXTER, Trading under the Name of WILLIAM J. BAXTER COMPANY, Respondent, *v.* MORRIS LUSTBERG and Others, Copartners Doing Business under the Firm Name of LUSTBERG, NAST & COMPANY, Appellants.

First Department, June 1, 1923.

Sales — action by seller to recover damages for breach of contract — verdict for plaintiff not against evidence — contract valid under Statute of Frauds — partial delivery was shown — memorandum was sufficient and was sufficiently signed — loss of profit on sale plus difference between cost to plaintiff and amount received on subsequent sale is proper measure of damages under Personal Property Law, § 145, subds. 2 and 4 — interest was properly included in verdict.

In an action by a seller of goods to recover damages for breach of the contract by the buyer, in which the defense interposed was that the defendants did not order the goods, the verdict of the jury in favor of the plaintiff was not against the weight of the evidence.

43

The Statute of Frauds is not a defense to this action, since there was a partial delivery of the goods covered by the order and there was a memorandum signed in the individual name of one of the defendants, which, though insufficient to constitute a complete contract, was sufficient to satisfy the statute.

It was proper to permit the plaintiff to recover as damages the loss of profit on the goods sold plus the difference between the cost of the goods to the plaintiff and the amount for which he sold the goods after their rejection by the defendants. This is the correct measure of damages under subdivisions 2 and 4 of section 145 of the Personal Property Law.

It was not error to include in the verdict interest on plaintiff's claim, since the amount due to the plaintiff was ascertainable by computation and was not unliquidated.

APPEAL by the defendants, Morris Lustberg and others, from a judgment of the Supreme Court in favor of the plaintiff, entered in the office of the clerk of the county of New York on the 26th day of June, 1922, upon the verdict of a jury, and also from an order entered in said clerk's office on the 21st day of June, 1922, denying defendants' motions for a new trial made upon the minutes and to strike out from the amount of the verdict the item of interest.

*Mervyn Wolff* [*Daniel Day Walton* of counsel; *Lemuel Bannister, William O. Hubbard* and *Benjamin Jaffe* with him on the brief], for the appellants.

*Gerald B. Rosenheim* [*Eugene E. Sperry* with him on the brief], for the respondent.

MERRELL, J.:

The action was brought to recover damages by reason of the alleged default of the defendants and their refusal to accept and pay for a quantity of cotton flannel alleged to have been sold by the plaintiff to the defendants. The plaintiff is a converter of cotton fabrics, including shirtings. The defendants are manufacturers of shirts. Owing to war conditions and the high price of flannels, the plaintiff placed upon the market a line of imitation flannels made of cotton and known as " cotton flannel." The plaintiff alleges that on October 15, 1918, the defendants, by Max Nast, one of the defendant copartners, ordered of the plaintiff one thousand pieces of shirtings at the agreed price of thirty-eight cents per yard. The defendants deny that any contract was entered into between the parties, and plead that, in so far as there was any contract, it was verbal and unenforcible by reason of the Statute of Frauds. The evidence disclosed that a few days prior to October 15, 1918, a salesman of the plaintiff by the name of Fox called at the defendants' place of business and displayed certain samples of plaintiff's line of cotton flannels which the plaintiff then had for sale. Among these samples was a style known as " Defender,"

priced at thirty-eight cents a yard. Another style was known as "Aurora," priced at forty-one cents a yard. These two fabrics were identical in weave and weight, differing only in the printing and dyeing of the "Aurora," which process added three cents per yard to the price. On the occasion shortly before October 15, 1918, plaintiff's salesman Fox displayed his swatches and samples to one of the defendants, Max Nast, who informed him that the defendants were not then interested, but would bear the line in mind, as he thought they might be interested later. These cotton flannel goods were purchased by the plaintiff before finishing and were then known as "in the gray," and at that time were of the weight of at least one pound to two and one-half yards. The evidence indicates that in the process of finishing the goods it was uncertain as to whether the weight would be lessened or increased. Plaintiff, his salesman Fox, and Hawkins, a buyer for Montgomery, Ward & Co. of Chicago, who testified in behalf of defendants, all agreed that the weight of the goods after finishing was problematical, and that such weight might be increased from two and one-half yards to the pound as the goods were " in the gray," or that it might be diminished by the finishing process.

The evidence shows that Hawkins, the representative of, and for many years a buyer for Montgomery, Ward & Co. of Chicago, came to the defendants' place of business with a view to entering an order for 2,000 dozen cotton shirts, and that on October 15, 1918, in company with the defendant Nast, Hawkins went to the plaintiff's place of business and there called upon Fox, plaintiff's salesman, to display the line of cotton flannel goods which he had theretofore shown to Nast. This was done, several different grades of goods being shown, and Nast and Hawkins going over the same carefully for the purpose of picking out goods suitable to be made into the 2,000 dozen shirts order which the defendants were expecting to receive from Montgomery, Ward & Co. The plaintiff's salesman, Fox, testified that, after examining very carefully the goods thus displayed, Nast suggested that he (Fox) leave the room, as he would like to confer with Mr. Hawkins. Fox complied with Nast's request, and returning a short time thereafter, was informed by Nast that the defendants thought they could use the " Defender " and "Aurora " styles, and asked Fox if he had an order blank there. Fox testified that he handed Nast an order blank of plaintiff's regular form, and which plaintiff kept for that purpose, and that Nast thereupon wrote out the order himself on said order blank of the plaintiff. These order blanks were in pad form, carbon paper being used for making a duplicate copy, in accordance with the usual custom of the plaintiff. Fox testified

that after Nast had made out the order for the 1,000 pieces of the flannel, he tore off the original, leaving the carbon duplicate for the plaintiff, and that the defendant well knew that plaintiff had such copy. In making out said order Nast wrote " Lustberg Nast " in the name space on the order blank, and then a description of the " Defender " and "Aurora " styles, and the quantity and the price to be paid for each, also the terms, 2/10–60 extra. Upon the trial Nast admitted that he had written such document, but insisted that it was not intended as an order, but was merely a memorandum sheet for his own guidance in examining goods at other establishments. Nast, however, failed to testify that goods of any other manufacturer were examined in connection with obtaining material for the Montgomery, Ward & Co. order. Within a day or two after this transaction, Nast sent another order to the plaintiff, which the latter regarded as a confirmation of the first order given October 15, 1918. This second order was somewhat different in form, particularly as to the terms, which were made 2/10–60 E. O. M., instead of 2/10–60 extra, the initials " E. O. M." signifying that the credit was from the end of the month, and also stating thereon that assortment was to be given after receipt of sample pieces, and that the finished goods were guaranteed to be two and one-half yards to the pound. The plaintiff testified that, when this second order was received, he called up Fox and told him that they did not sell goods guaranteeing the weight after being finished, and would not consent to the terms, " E. O. M.," and insisted that the usual terms, 2/10–60 extra, should prevail in relation to the contract. Plaintiff testified that the defendants acceded to this condition and stated that the contract as originally made was satisfactory. The testimony of the plaintiff was also to the effect that, subsequently to the order of October 15, 1918, the defendants were permitted to change the order so as to eliminate the "Aurora" grade and to take the 1,000 pieces in the " Defender " grade of goods. The defendant Nast denied absolutely making any contract, and insisted, as before stated, that the paper which he drew up was merely a memorandum for his own guidance, and that he did not know that any carbon copy was left with the plaintiff. Nast denied that he ever agreed to purchase any goods of the plaintiff. The plaintiff testified that about November 12, 1918, he received a call from the defendant Nast, and that Nast then told him that the defendants could not use the goods. Plaintiff testified that he then said to Nast, " You bought them," and that Nast replied, " Yes, I know we bought them, but we bought them for one man. We can not use those in our regular lines, but I will tell you what we will do, you take 500 and we will call the thing square; "

that plaintiff declined to accede to such proposition of the defendant Nast, and said, " There is no reason for doing that. The market is going down and there is no reason I should take a loss on it; " that Nast then told him that the order for shirts, which they had, requiring the use of this cloth, had been canceled. Soon after taking the order for the goods in question, Fox, plaintiff's salesman, went upon an extended business trip upon the road. Fox testified that upon his return he saw all three of the defendants, who told him that there had been some controversy regarding the memorandum which they had left with him, and that the order which they had received from Montgomery, Ward & Co. had been canceled, and that was the reason they would not take the merchandise; and that they had no particular use for the flannels and wanted to cancel the order and leave the goods with the plaintiff. Fox testified that he told the defendants that this was impossible, and that Nast then made claim that there was actually no order made, and that what he signed was only a memorandum.

The evidence presented a sharp dispute of fact, which was left to the jury to determine under a very fair and impartial charge. The plaintiff was allowed to prove his damages, based upon the loss of profits through the failure of the defendants to carry out the contract, plus the difference between the cost of the goods in the gray and their market value at the time of the breach, besides interest. No proof whatever was offered by the defendants on the question of damages, and no objection was made to the reception of the proof as to the measure of damages which was offered by the plaintiff. The court charged the jury that, if they found that the parties entered into a contract as claimed by the plaintiff, then the plaintiff was entitled to judgment for $6,372, with $1,179.66 interest, making in all $7,551.66. The jury rendered a verdict in that amount in plaintiff's favor. The evidence clearly shows that there was a fall in prices owing to the signing of the armistice agreement on November 11, 1918, within a month from the time this order was given, and that following that the order which Montgomery, Ward & Co. gave the defendants for the 2,000 dozen shirts was canceled. The evidence shows that, immediately following the making of the alleged contract on October 15, 1918, and on the same day, Montgomery, Ward & Co. ordered the 2,000 dozen shirts from the defendant, made from the " Defender " cloth which had been selected and ordered of the plaintiff. As before stated, the testimony presented nothing but a question of fact as to whether or not the parties entered into the contract in suit, and the jury resolved such question of fact in accordance with plaintiff's contention.

It is the claim of the defendants, appellants, that the verdict was

against the weight of the evidence as to the making of the contract in suit. I do not think such was the fact. There are many circumstances showing that the memorandum drawn up by Nast and to which he appended the name of " Lustberg Nast," was more than a mere memorandum for his own convenience. Nast made a very lame attempt to explain the making of this paper upon the ground that he needed it for his own information and guidance in visiting other establishments and in making selection of the necessary goods to be used by his firm, and that he put the name of his firm upon it, so that in case it was lost it could be forwarded to the defendants. Hawkins, the representative of Montgomery, Ward & Co., testified that, when they left plaintiff's place of business on the 15th of October, 1918, they had no intention of looking further or elsewhere for the necessary goods from which to manufacture the order of shirts; and that they went immediately from plaintiff's place of business to defendants' place; and that Hawkins then, in behalf of Montgomery, Ward & Co., placed the order for the 2,000 dozen shirts. Nast admitted that the terms of credit which he placed upon the original order were in his handwriting, but insisted upon the trial that they were put there by mistake, and that the real terms were 2/10–60 E. O. M. The fact that on October 15, 1918, after visiting plaintiff's place of business and selecting the shirtings, the defendants entered into the arrangement with Montgomery, Ward & Co. to manufacture the shirts, is a strong circumstance, showing that the goods from which those shirts were to be manufactured were ordered of the plaintiff as claimed. It also appears that in the piece goods book of the defendants there was entered as of October fifteenth the order for the shirts to be made from plaintiff's " Defender " style of goods, and that on the original memorandum left with the plaintiff the defendant Nast wrote in plaintiff's style numbers. These circumstances seem to fully corroborate the claim of the plaintiff as to the making of the contract on October 15, 1918. It appears quite conclusively that the real reason why the defendants refused the goods was that the bottom had fallen out of the market, and that the goods which the defendants had ordered could not be used by them by reason of the cancellation of the Montgomery, Ward & Co. contract. Indeed, the testimony of the plaintiff is to the effect that the defendants admitted the making of the contract, but sought its cancellation because they could not use the goods which they had ordered. Cancellation was refused by the plaintiff. The evidence presented a question of fact for the jury as to whether or not there was a meeting of the minds of the parties on October 15, 1918, as claimed by the plaintiff.

I do not think the Statute of Frauds (Pers. Prop. Law, § 85, as added by Laws of 1911, chap. 571) stands in the way of a recovery by the plaintiff. In the first place there was a partial delivery of the goods covered by the order, sufficient to take the case out of the operation of the statute, and there certainly was the memorandum signed by the defendant Nast at the time of the sale. While, perhaps, the memorandum was insufficient to constitute a complete contract, it nevertheless was sufficient to relieve the objection of the Statute of Frauds. The memorandum of October fifteenth was sufficiently " signed " by the defendants and they were bound thereby. (*Cohen* v. *Walker & Co., Inc.,* 192 N. Y. Supp. 228, 229; *Cohen* v. *Wolgel,* 107 Misc. Rep. 505; affd., 191 App. Div. 883.) It was not necessary that such memorandum be signed by the defendants with the intent to satisfy the statute. So long as the purpose of the requirement was fulfilled, the intent with which it is made is immaterial. (Williston Sales, § 106.)

No objection whatever was made by the defendants to the proof of damage offered by the plaintiff. The defendants offered no proof of damage to meet the same, nor did they make any objection upon the trial to the rule adopted by the trial justice in submitting the case to the jury. The plaintiff proved without objection that the cost of manufacture of the goods covered by the contract was thirty-two and eighty-one one-hundredths cents per yard, and that the contract price was thirty-eight cents per yard, leaving a profit of five and nineteen one-hundredths cents a yard to the plaintiff and a total profit upon the 60,000 yards covered by the contract of $3,114; that as soon as possible after the breach the goods were disposed of by the plaintiff at the highest market price obtainable for eighteen and thirty-two one-hundredths cents per yard, the plaintiff thereby sustaining a loss of five and forty-three one-hundredths cents a yard, and a total loss of $3,258. This made plaintiff's aggregate loss $6,372, which, with added interest, amounted to $7,551.66. The jury found in favor of the plaintiff in that amount. I think the correct measure of damages was adopted. Subdivision 2 of section 145 of the Personal Property Law (as added by Laws of 1911, chap. 571) provides that: " The measure of damages is the estimated loss directly and naturally resulting, in the ordinary course of events, from the buyer's breach of contract."

There can be no question that by reason of the defendants' refusal to accept and pay for the goods the plaintiff lost the profit which he would have received had the defendants performed, and surely the plaintiff was entitled to recover the difference between what he paid for the goods and what he was able to obtain upon a sale thereof after defendants' default. Subdivision 4 of section

145 of the Personal Property Law (as added by Laws of 1911, chap. 571) provides as follows: " If, while labor or expense of material amount are necessary on the part of the seller to enable him to fulfill his obligations under the contract to sell or the sale, the buyer repudiates the contract or the sale, or notifies the seller to proceed no further therewith, the buyer shall be liable to the seller for no greater damages than the seller would have suffered if he did nothing toward carrying out the contract or the sale after receiving notice of the buyer's repudiation or countermand.  The profit the seller would have made if the contract or the sale had been fully performed shall be considered in estimating such damages."  (See, also, *Kingman & Co.* v. *Western Mfg. Co.*, 92 Fed. Rep. 486, 490.)

I think no error occurred by the inclusion in the verdict of interest on plaintiff's claim.  No objection was made by defendants when proofs were offered by the plaintiff as to the amount of interest upon his claim, nor was any exception made to the charge of the court that the jury might include such interest, the amount thereof being stated by the court.  After the rendition of the verdict, counsel for the defendants moved to set the same aside upon the ground that all items of interest embodied in or incorporated in the verdict were upon unliquidated and not upon liquidated damages.  The Court of Appeals in a recent case has held that " The test is not whether the demand is liquidated.  Was the plaintiff entitled to a certain sum?  Should the defendant have paid it? "  (*Faber* v. *City of New York*, 222 N. Y. 255, 262.)

In *Blackwell* v. *Finlay* (233 N. Y. 361) the recovery was upon the exact amount of plaintiff's demand for professional services as an attorney.  With reference to interest the Court of Appeals in that case said (at p. 363): " It would indeed work great injustice if one who renders ordinary services, whether professional or otherwise, *or sells ordinary commodities*, could not, by presenting his bill and demanding payment, put the debtor in default and start interest running.  The rule is a sound one, and commendable in its application here, *where the plaintiff has recovered the exact amount demanded by him from defendant.*"  (Italics are the writer's.)

In this case the jury has found for the plaintiff for the exact amount for which he sued.  That amount was subject to ascertainment by computation, and interest was properly allowable.

The judgment and order appealed from should be affirmed, with costs.

CLARKE, P. J., SMITH, FINCH and McAVOY, JJ., concur.

Judgment and order affirmed, with costs.